IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| WISEMAN OIL CO., INC., | ) | |
| ESTATE OF JOSEPH WISEMAN, | ) | |
| ESTATE OF RUTH N. WISEMAN, | ) | |
| EILEEN FANBURG, AS | ) | |
| EXECUTRIX | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 011-1011 |
| | ) | District Judge Joy Flowers Conti |
| TIG INSURANCE CO. F/K/A | ) | Chief Magistrate Judge Lisa Pupo Lenihan |
| TRANSAMERICA INSURANCE | ) | ECF Nos. 64, 67, 69 |
| CO. | ) | |
| | ) | |
| Defendant. | ) | |


**REPORT AND RECOMMENDATION ON
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT ON DEFENDANT'S DUTY TO
DEFEND, AND PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON
THE ISSUE OF REGULATORY ESTOPPEL**


**I.  RECOMMENDATION**

For reasons set forth at length in the case history and legal analysis below, this Report

recommends that Defendant's Motion for Summary Judgment (ECF No. 69) be denied, Plaintiffs'

Motion for Partial Summary Judgment on Defendant's Duty to Defend (ECF No. 64) be granted in

part and denied in part, and Plaintiffs' Motion for Partial Summary Judgment on the Issue of

Regulatory Estoppel (ECF No. 67) be denied as moot.   More particularly, the Report recommends

that Plaintiffs' Motion for Partial Summary Judgment on Defendant's Duty to Defend be granted

in part as the Court has determined that the putative policy terms would not have clearly excluded,

under the applicable standards, potential insurance coverage as to the underlying litigation, but

would rather have given rise to a duty to defend on the part of the Defendant.   Neither the putative

policy definitions of the potential insureds nor policy exclusions (nor any other putative policy

language before this Court) would abrogate – under the relevant record - Defendant's duty to

defend.[1]


## II.  CASE HISTORY; SUMMATION

The claims presently before this Court are for (1) declaratory judgment as to Defendant

TIG Insurance Company's (hereafter "Defendant" or "TIG") duty to defend; (2) breach of contract

---

[1]  The Court notes its express reservation – at Defendant's request - of the legal
determination of the existence of the policies.   See observations in prior Court writings and *infra,*
at Section II(B).   Cf. May 29, 2012 Report and Recommendation on Defendant's Motion for
Judgment on the Pleadings (hereafter "May 29, 2012 Report and Recommendation") at n. 11
(citing testimony of Defendant's Rule 30(b)(6) representative that in 2005 TIG had approximately
*210,000 boxes* of un-indexed documents, and searched for policies by looking through
approximately 100 three-ring binders containing *unorganized* "listings of numbers" with a policy
search success rate "in the *50 percent* range"); see also Plaintiffs' Opposition to TIG Insurance
Company's Motion for Judgment on the Pleadings (hereafter "Plaintiffs' Opposition to
Judgment") at 17-23 and Ex. A thereto.

concerning Defendant's duty to defend and covenant of good faith and fair dealing; and (3) breach of TIG's statutory duty of good faith under 42 Pa. Cons. Stat. Section 8371.

## A. CERCLA Complaint

Plaintiffs Wiseman Oil Co., Inc. ("Wiseman Oil"), Estate of Joseph Wiseman, Estate of Ruth N. Wiseman, and Eileen Fanburg as Executrix (hereafter collectively "Plaintiffs" or "Wisemans") assert that they were entitled to a defense by the insurer, TIG, against claims brought in this Court by the United States under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA") (the "Underlying Litigation") for environmental contamination at property previously owned by Joseph and Ruth Wiseman and leased to their family company,[2] and on which that company, Wiseman Oil, previously operated an industrial/commercial waste treatment/reprocessing facility.[3]   Under the Fourth (and final)

---

[2] Joseph and Ruth Wiseman were founders, shareholders, and Chairman of the Board and Secretary/Treasurer, respectively, of Wiseman Oil.   At times relevant to the underlying litigation, their son Robert Wiseman served as President, and their son Stephen served as Executive VP of Sales and Marketing. The two sons, their parents, and a close friend of Joseph Wiseman comprised the five-member Board. Share ownership was, at the time of Wiseman Oil's late 1981 bankruptcy, divided fairly equally between the parents, their two sons, and one daughter, with a slightly larger share (26.75%) to the parents and a small 5% interest to another individual.   The land on which Wiseman Oil operated was leased by Joseph and Ruth Wiseman to their family company under an agreement requiring that Wiseman Oil maintain insurance for the benefit of Joseph and Ruth Wiseman as lessors.   See Transcript of Oral Argument of November 15, 2012 (hereafter "November Oral Argument"); Plaintiffs' Statement of Undisputed Facts in Support of Motion for Partial Summary Judgment (Duty to Defend) (hereafter "Plaintiffs' SUF for PSJ on Duty") (ECF No. 76) at 3.   The property was collateral for a loan to Wiseman Oil, and was obtained by Breslube during the family company's bankruptcy in December 1981- early 1982, following Equibank's foreclosure on the mortgage on the site.

[3] Commercial customers named as Defendants in the CERCLA action included Alcoa, Allegheny

Amended Complaint (the "CERCLA Complaint"), liability was alleged for costs "incurred by the United States in responding to releases or threatened releases of hazardous substances at or from" the site,[4] which was subsequently operated by Breslube-Penn, Inc. ("Breslube"). Breslube acquired said property and facilities, and resumed waste oil reprocessing operations thereon, following Wiseman Oil's bankruptcy in late 1981-1982 and until "late 1985 or early 1986". Thereafter, Breslube "used the site as a waste oil storage and transfer station for several years", *i.e.*, "through the early 1990s." CERCLA Complaint at 1-8 (outlining suit to recover costs related to "Breslube Penn Superfund Site").

The CERCLA Complaint names the Estates of Joseph and Ruth Wiseman, and their daughter Eileen Fanburg, Executrix, "because Joseph Wiseman and Ruth Wiseman, husband and wife, jointly owned all or portions of the real property on which the [subject] site is located between 1974 and 1982, when Wiseman Road Oil and/or Wiseman Oil Company ('Wiseman Oil') collected and stored waste oil on the property and/or operated a waste oil recycling operation on

---

Ludlum Corp., Atlantic Richfield Co., BP Products of North America, CBS Corp., Chevron U.S.A., Inc., CSX Transportation, Inc., Exxon Mobil Corp., Ford Motor Co., General Electric Co., General Motors Corp., Pennzoil-Quaker State Co., Port Authority of Allegheny County, Shell Oil Co., Texaco Co., and United States Steel Corp.

[4] See also CERCLA Complaint at 28 (asserting that there were "releases . . . or the threat of releases" at the site) and that cleanup costs to date had exceeded $4M. As Plaintiffs correctly note, the definitions of "disposal" and "releases" incorporated into the Complaint include sudden and accidental occurrences such as "spilling", "leaking" or "escaping" of contaminants. See 42 U.S.C. Sections 9601(22) & (29); id. at Section 6903(3).

the property" and neither Estate had been closed.[5]    CERCLA Complaint at 13.    Robert Wiseman

is named as "the son of Joseph and Ruth Wiseman, [who] was the President of Wiseman Oil

sometime between 1978 and 982, when Wiseman Oil operated a waste oil/sludge reprocessing

facility on the site".    He "was active in the day-to-day operations" and "financial decisions" and

"in operational control of the site during part or all of the time period when Wiseman Oil" was

operating.    CERCLA Complaint at 23.    The Complaint asserts liability against both Wiseman

Estates (and their Executrix) and their son Robert under Section 107(a)(2) of CERCLA, which

covers "any person who at the time of disposal of any hazardous substances owned or operated any

facility at which such hazardous substances were disposed of".    CERCLA Complaint at 26-28.

This Court's review of the progression of the CERCLA Complaint amendments indicates that

additional allegations and parties were being added to support financial recovery as the Federal

government ascertained more specific information.

     The leading "General Allegations" of the Complaint are that "*Wiseman Oil constructed a

used oil/sludge reprocessing facility* on the site" and "[f]rom 1978 through 1982 *Wiseman Oil

received and reprocessed* a variety of waste[s]".    In addition, "prior to the recycling period,

'Wiseman Road Oil' received and stored waste oils on the site for use in its business."    The

"disposal and treatment of hazardous substances" within CERCLA "occurred at the site *while

under Wiseman Oil's operation and control.*"    "In 1981, Wiseman Oil Co. filed a petition in the

Bankruptcy Court for the Western District of Pennsylvania . . . following Equibank's foreclosure

_____

[5]  Joseph Wiseman died in 1996, and Ruth Wiseman died in 2006.

on a mortgage" and in October, 1982 Breslube "purchased from Joseph and Ruth Wiseman the real property on which the site is located" and "reopened the former Wiseman Oil waste oil/sludge reprocessing facility" shortly after acquiring the property.   CERCLA Complaint at 23-24 (emphasis added); <u>see also</u> Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment (hereafter "Plaintiffs' Memo Opposition to Defendant's MSJ") (ECF No. 83) at 2.   An EPA assessment of the site in 1993 revealed numerous hazardous substances including arsenic, mercury, lead, volatile organic compounds, polychlorinated biphenols ("PCBs") and polyaromatic hydrocarbons ("PAHs"), and it began a removal action for over 6,000 tons of contaminated soils and sludges.

A Consent Decree was entered in the Underlying Litigation on April 20, 2011. <u>See</u> <u>United States v. AK Steel Corp., *et al*</u>, CA No. 97-1863, Docket No. 604.   Accordingly, no judgment was ever rendered "concerning the *types of releases* of hazardous substances that occurred during Wiseman Oil's operations."   Plaintiffs' Memo Opposition to Defendant's MSJ at 2-3 (emphasis added).   Under the terms of that Consent Decree and Final Judgment, resolving the EPA's claims against 37 Defendants, claims were resolved against the Estates of Joseph and Ruth Wiseman, their Executrix and the Wisemans' son, Robert.   The United States "reviewed the Financial Information submitted by the [Estates and their Executrix]" and Robert Wiseman, to satisfy itself of the parties' financial ability "to pay response costs" apportionments.   <u>See</u> Consent Decree at 3-4.   The Consent Decree expressly defines the "Estates" as meaning "the Estate of Ruth Wiseman, the Estate of Joseph Wiseman, the Executrix of the Estate of Ruth Wiseman, the

Executrix of the Estate of Joseph Wiseman, Wiseman Oil Corp. (and predecessor corporations including Wiseman Road Oil) ('Wiseman Oil') and all officers and shareholders of Wiseman Oil except Robert Wiseman".   The Response Cost amounts due from the Estates totaled $700,000 plus interest (a slight majority of the total settlement amounts due from the seven parties named in the Table) and from Robert Wiseman $2,500.   See Consent Decree at 7.   And the Estates (as defined) were "jointly and severally liable for the payments set forth", and nothing in the Consent Decree barred "the Estates from pursuing claims for insurance benefits or from bringing any claims against any insurance company."   Id. at 7, 12.

### B.   Insurance Policies; Requests for Defense

In July, 2004, Plaintiffs corresponded with TIG, providing the First Amended Complaint in the Underlying Litigation, enclosing a certificate of insurance for policy number 12513225, and requesting a defense.[6]   By writing of July 30, 2004, Defendant's claims manager indicated that the Complaint allegations sought "recovery of response costs from the Defendants, including the owners and officers of Wiseman Oil Corp., incurred by the [EPA] in responding to releases or threatened releases of hazardous substances at or from the above mentioned site.   The [United States] alleges that Joseph and Ruth Wiseman co-owned and operated the site . . . ."   See

---

[6] It appears that Defendant TIG ceased being an operating company sometime between 1997 and 2004.   See, e.g., Transcript of Oral Argument on April 5, 2012 ("April Oral Argument") at p. 30.

Plaintiffs' Memo Opposition to Defendant's MSJ at 3 (quoting Pl. Ex. 4, Para. 5 & Att. C at Wiseman-028266).[7]

In April, 2005, Defendant advised that it had "conducted a diligent search" and was "at this time . . . unable to provide any coverage determination" and requested that the Wisemans provide "a copy of the alleged policy . . . [or] additional secondary evidence". The Underlying Litigation was administratively closed until December, 2009 and in February, 2010, Plaintiffs provided TIG: (1) a certificate of insurance discovered in the files of a customer and indicating the existence of policy 12513225 (covering September 1980-1981); and (2) certificates of insurance for three additional insurance policies numbered 12069979 (September 1979-1980), 18438624 (September 1981-1982), and 11324471 (September 1978-79).[8] Defendant responded that it would "continue to keep [Plaintiffs] updated as to the status of our investigation." By

---

[7] See also Am. Contract Bridge League v. Nationwide Mut. Fire Ins. Co., 752 F.2d 71 (3d Cir. 1985) discussed *infra;* Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Judgment (Duty to Defend) (hereafter "Plaintiffs' Memo in Support of PSJ on Duty") (ECF No. 65) at 20.

[8] Each of the Certificates indicates it is "to certify that the policies of insurance listed below have been issued to the insured named above and are in force at this time" and includes name(s) of insured, insurance company, type of insurance, policy number, policy periods, limits of liability ($1M) and the producing agency. Plaintiffs assert that these certificates "show that the Wisemans had successive one-year liability policies" with Defendant between 1978 and 1982. Plaintiffs have also produced other evidence of insurance - *e.g.*, the deposition testimony (regarding, *e.g.*, business practice of issuing certificates of insurance only with knowledge/review of details of insurance policy in effect) and other evidence (such as handwritten notes and calculations of annual insurance premiums for "Key Accounts", including Wiseman Oil, in 1980) of Defendant's licensed agent insurance brokers –Young Brothers Insurance, and a related line item on the CPA-prepared income tax return in calendar year 1978. See generally Plaintiffs' Response to Defendant's Statement of Material Facts (providing citations to record) (ECF No. 82); cf. Plaintiffs' SUF for PSJ on Duty.

correspondence of June 22, 2010, TIG indicated that it had "conducted a diligent and comprehensive search of [its] records" and that in the absence of copies of the alleged policies, it was "without foundation to further proceed in the handling of this matter" and that if it did not receive the additional information requested within thirty (30) days it would "take no further action."

The deposition testimony of TIG's Rule 30(b)(6) representative in this litigation is that "over its operating life TIG's document policy was to stick stuff in boxes. It had no central database, no standard way of identifying things, and boxes of documents could be sent to Iron Mountain for storage but with no rhyme or reason." See January 31, 2012 Deposition at 192 (Ex. A to Plaintiffs' Opposition to Judgment). See also id. at 193, 198 (testifying that there are presently still 160,000 unopened boxes and "no way to figure out if Wiseman Oil is in any of those boxes").

### C. <u>Present Litigation and Pending Motions</u>

Plaintiffs' Complaint in this action was filed on August 4, 2011. As noted above, presently pending are Defendant's Motion for Summary Judgment (ECF No. 69), and Plaintiffs' Motions for Partial Summary Judgment on (a) Defendant's Duty to Defend (ECF No. 64, hereafter "Plaintiffs' Motion for PSJ on Duty") and (b) Regulatory Estoppel (ECF No. 67, hereafter "Plaintiffs' Motion for PSJ on Regulatory Estoppel"). This Report recommends that Defendant's Motion for Summary Judgment be denied, that Plaintiffs' Motion for Summary Judgment on Defendant's Duty to Defend be granted in part and denied in part, and that Plaintiffs' Motion for

PSJ on Regulatory Estoppel be denied as moot.   The Court again notes its express reservation – at Defendant's request - of the legal determination of the existence of the policies.

More particularly, Defendant filed a Motion to Bifurcate and Stay, and requested that this Court, in the interest of judicial efficiency, bifurcate discovery and afford Defendant an opportunity – by a phasing of Motions in this case - to present pleadings supporting its strongly-asserted position that, even *presuming the insurance policies identified in the Certificates of Insurance had been issued, and presuming they had been issued as Defendant's standard policy form for comprehensive general liability insurance* (hereafter "TIG's CGL Policy" or the "CGL Policy") Defendant would still have owed no defense or coverage-related duties to the Plaintiffs. Accordingly, following April Oral Argument, and by its Memorandum Order of May 22, 2012 (hereafter the "Memorandum Order"), the Court directed that Defendant's dispositive motion address its defenses to coverage, including contentions regarding the identities of the persons sued, the pollution exclusion clause, and any other coverage issues it wished to interpose, as well as support for its contention that "the absence of coverage was, under the applicable standard of law, sufficiently clear at the time of tender (or any other relevant time) to excuse it from a duty to defend as well as an ultimate duty of indemnification".   Memorandum Order at 2.   The Court further directed that Plaintiffs should "conversely, present . . . evidence that [applicable policy] terms encompass[ed] coverage in the underlying case or, alternatively, that the question of

coverage was sufficiently possible to give rise to a duty to defend" and should include Plaintiffs'

contentions regarding regulatory estoppel.   Id. at 2-3.[9]


III.   **STANDARD OF REVIEW**

A Motion for Summary Judgment may be granted only if, drawing all inferences in favor

of the non-moving party, "the pleadings, the discovery and disclosure materials on file, and any

affidavits show that there is no genuine issue as to any material fact and that the movant is entitled

to judgment as a matter of law."   Fed.R.Civ.P. 56(c)(2).   A principal purpose of the rule is to

dispose of factually unsupported claims or defenses.   Where the Defendant is the moving party, it

must point to the absence or insufficiency of Plaintiff's evidence offered in support of the essential

elements, to demonstrate that it is entitled to judgment.   See Celotex Corp. v. Catrett, 477 U.S.

317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).   And Plaintiff

must identify evidence of record that supports those elements.   Id.

Upon a Motion for Summary Judgment and considering a duty to defend under an

insurance policy, the Court resolves all doubts in favor of the insured and coverage clauses are

interpreted broadly.   See, *e.g.*, Biborosch v. Transamerica Ins. Co., 603 A.2d 1050, 1052 (Pa.

Super. 1992); Penn Nat'l Ins. v. HNI Corp., 482 F.Supp.2d 568, 607 (M.D. Pa. 2007).   Policy

---

[9]  Defendant has also filed Objections Pursuant to Rule 56(C)(2) to Plaintiffs' Statement of
Material Facts ("Defendant's Objections to Plaintiffs' SMF").   See ECF Doc. Nos. 86 and 90.
The Court is well-acquainted with the scope of evidentiary materials and statements of facts
properly before it and has weighed, in its ultimate recommendations, the parties' submissions only
in accordance with those parameters.   Defendant's Objections should therefore be denied.

exclusions are interpreted narrowly,[10] and where Defendant asserts this affirmative defense it bears the burden of proof.  See, *e.g.*, HNI Corp., 482 F.Supp.2d at 607; Canal Ins. Co. v. Underwriters at Lloyd's of London, 435 F.3d 431, 435 (3d Cir. 2006).


## IV.  ANALYSIS AS TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant's Motion for Summary Judgment raises essentially two (2) grounds:   (A) Wiseman Oil was never a CERCLA defendant, and Plaintiffs were not sued in any covered capacity in the Underlying Litigation, *i.e.*, "as officers, directors or shareholders of Wiseman Oil, or in connection with any other business", but were subjected to liability *solely* as co-owners of the property on which Wiseman Oil conducted its storage/reprocessing operations;[11] and (B) as liability was not the result of any "sudden and accidental" occurrence, but solely of releases occurring gradually over time, liability was clearly excluded from coverage under TIG's CGL Policy pollution exclusion under "consistent[] determin[ations]" that the "Third Circuit has acknowledged . . . as the law in Pennsylvania."[12]   This Report will take these grounds in turn.

---

[10] Cf. Defendant's Brief in Support of Motion for Summary Judgment ("Defendant's Brief in Support of MSJ") (ECF No. 71) at 4 (noting that "task of interpreting a policy is generally performed by a court"); Plaintiffs' Memo in Support of PSJ on Duty at 4 ("The interpretation of the scope of coverage of an insurance contract is a question of law properly decided by the court.") (quoting J.C. Penney Life Ins. Co. v. Pilosi, 393 F.3d 356, 360 (3d Cir. 2004)).

[11] Defendant's Brief in Support of MSJ at 1.

[12] Id. at 14.

As a preliminary matter, however, the Court clarifies that the standard under which it considers the insurer's duty to defend is not, as Defendant would have it, whether the underlying Complaint expressly alleges specific factual predicates clearly within the applicable policy terms. To the contrary, the duty to defend arises whenever a fair reading of the underlying Complaint, with its assertions of relevant general or specific factual and statutory bases of liability, does not *expressly rule out* the possibility of insurance coverage under the applicable policy terms.   <u>See,</u> <u>*e.g.,*</u> <u>Sikirica v. Nationwide Ins. Co.</u>, 416 F.3d 214 (3d Cir. 2005) (discussing duty to defend where Complaint "avers facts that might support recovery"); <u>Air Prods. & Chems., Inc. v. Hartford Acc.</u> <u>& Indem. Co.</u>, 24 F.3d 177, 179-180 (3d Cir. 1994) (observing that Pennsylvania law requires insurer of general liability policy to provide defense when allegations "*could potentially* fall within the coverage" and where allegations "do not establish coverage, although neither do they expressly rule it out") (emphasis added); <u>Gedeon v. State Farm Mut. Auto. Ins. Co.</u>, 410 Pa. 55, 58 (1963) (obligation to defend arises when complaint "may potentially come within the coverage of the policy"). [13]   <u>See also</u>, *e.g.*, <u>Moffat v. Metropolitan Casualty Ins. Co. of N.Y.</u>, 238 F.Supp. 165, 173 (M.D. Pa. 1964) (noting obligation to defend if complaint "alleged facts which would support a recovery under the policy"; further noting that in Pennsylvania "the insurer is required to defend if the claim potentially comes within the coverage of the policy" and that "[a] contract of insurance must be interpreted in the light of the subject matter"); <u>id.</u> at 175 (admonishing that "[i]n the

---

[13] Conversely, an insurer is excused from its duty to defend if "it is apparent from the face of the complaint that none of the [allegations] fall within the coverage".   <u>C. Raymond Davis & Sons,</u> <u>Inc. v. Liberty Mutual Ins. Co.</u>, 467 F.Supp. 17, 19 (E.D. Pa. 1979).

inspection of the complaint to determine potential coverage, the insurer cannot take the viewpoint of a common law pleader"; rather, "[i]f it is in doubt, it may defend with the understanding that it is not an admission of coverage" and '[i]f it elects not to defend, it does so at its peril").[14]

## A. <u>Existence of Potential Insured</u>

### 1. <u>Wiseman Oil</u>

TIG's CGL Policy covers an entity insured, *e.g.*, Wiseman Oil, and those acting within the scope of their entity affiliations. More particularly, the definition of an Insured under TIG's standard policy is "(a) the named insured and, if an individual, the spouse of such named insured if a resident of the same household; (b) if the named insured is designated in the declarations as . . . (3) other than an individual, partnership or joint venture, the organization so designated and any executive officer, director or stockholder thereof while acting within the scope of his duties as such." <u>See</u> Plaintiffs' Memo Opposition to Defendant's MSJ at 4 (quoting Doc. No. 66-15 at TIG 02169 and other documents of record); <u>id.</u> at 14; Defendant's Brief in Support of MSJ at 10; <u>see also</u> Plaintiff's Memo in Support of PSJ on Duty at 17.

As detailed in Section II above, the Underlying Litigation was an action by the Federal government to recover costs to remediate environmental contamination (releases or threatened releases) at a commercial waste/oil reprocessing facility operated by Wiseman Oil until its

---

[14] <u>Cf.</u> <u>Bracciale v. Nationwide Mut. Fire Ins. Co.</u>, 1993 WL 323594 at *5 (E.D. Pa. Aug. 20, 1993) (noting that where insurer refuses to provide defense it "may not [then] protest that it was deprived of an opportunity to litigate and establish that the underlying claims fell outside its policy coverage"). <u>See generally</u> Plaintiff's Memo in Support of PSJ on Duty at 15-17 (providing additional citations regarding scope of duty to defend and consequences of refusal).

bankruptcy in December 1981, and thereafter reopened and operated by Breslube.  The still-open

Estates of Joseph and Ruth Wiseman were assertedly liable because (a) the Wisemans "jointly

owned all or portions of the real property" on which "Wiseman Oil constructed a used oil/sludge

reprocessing facility" and on which Wiseman Road Oil and/or Wiseman Oil "collected and stored

waste oil   . . . and/or operated a waste oil recycling operation"; and (b) Section 107(a)(2) of

CERCLA affords liability against "any person who at the time of disposal of any hazardous

substances owned or operated any facility at which such hazardous substances were disposed of."

This language does *not* preclude a conclusion that the government sued the Estates *both* because

they owned the property and because their family business "operated" the causal commercial

enterprise on that property.[15]   The government was, in the progression of its Complaints,

continuing to add more specific individual allegations that would assist it in establishing/extending

its ability to recover costs from individuals/entities with sufficient financial resources to pay

apportioned contribution amounts.   See *supra* Section II(A).

    Moreover, as discussed above, Defendant's own claims adjuster, by writing of July 30,

2004, summarized the Underlying Litigation, stating (without equivocation or indication that, as

---

[15]  Compare Defendant's presumptive assertion at November Oral Argument that Plaintiffs were
not sued because of any acts of Wiseman Oil.   Cf. Plaintiffs' Memo Opposition to Defendant's
MSJ at 12 (citing cases in which Plaintiffs were held liable as owners and operators, both); id. at
13, n. 1 (distinguishing cases cited by Defendant which concerned CERCLA liability of banks
taking title to contaminated property); Defendant's Brief in Support of MSJ at 7 (citing United
States v. Pesses, 1996 WL 143875 (W.D. Pa. Feb. 14, 1996) (noting that Section 107(a)(2)
imposes liability "not only for active involvement in the [polluting activity] at the facility, but also
for 'ownership ' of the location of the facility at [the] time")).

Defendant argued at the November oral argument, he was reporting a litigation position of the Wisemans' legal counsel with which he disagreed) that (a) the CERCLA action sought "recovery of response costs from the Defendants, including the owners and officers of Wiseman Oil Corp., incurred by the [EPA] in responding to releases or threatened releases of hazardous substances at or from the above mentioned site" and (b) he understood the government to be alleging "that Joseph and Ruth Wiseman co-owned and operated the site . . . ." This Report and Recommendation certainly agrees with Defendant that such writing constitutes neither a waiver nor an admission.[16] It is, however, significant indicia of Defendant's own contemporaneous understanding of the possible parameters of the Underlying Litigation, and Defendant's own assessment at the time as to whether it would, assuming the existence of a CGL Policy, owe a duty to defend. See, *e.g.*, Am. Contract Bridge League v. Nationwide Mut. Fire Ins. Co., 752 F.2d 71, 75 (3d Cir. 1985) (where insurer issued letter "recogniz[ing] certain officers of the insured organization] as insureds under the terms of its policy", Court held that said individuals "could potentially qualify as insureds" and insurer "was obliged to defend them"); see also Plaintiffs' Memo Opposition to Defendant's MSJ at 15.[17] *The Court finds the language of the CERCLA Complaint sufficient basis on which to deny Defendant's asserted entitlement to summary*

---

[16] Defendant's Reply Brief in Opposition to Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Defendant's Reply Brief in Opposition to Plaintiff's Opposition to MSJ") (ECF No. 99) at 4.

[17] Cf. Defendant's Reply Brief in Opposition to Plaintiff's Opposition to MSJ at 3-4 (characterizing "acknowledgement letter from TIG" as "describ[ing] the nature of the government's claims improperly" and containing "inadvertent inaccuracy").

*judgment on grounds that the Underlying Litigation was unequivocally outside potential coverage afforded to Wiseman Oil, or to the Wisemans as its officers, directors or shareholders (and, conversely, to grant in part Plaintiffs' Motion for Partial Summary Judgment on this issue); and this Report recommends that the Order so hold.*

The Court further notes, however, that the terms of the Consent Decree also indicate that liability premised in part on Joseph and Ruth Wiseman's affiliations with their family business was a not only a possible, but probable, understanding of the government's position during the course of the Underlying Litigation.[18]   As detailed above, the family business, Wiseman Oil, had been bankrupt and had ceased operation for over 15 years at the time the Federal government initiated the Underlying Litigation in 1997.   Joseph Wiseman died in 1996 and, by the time of the Consent Decree, Ruth Wiseman was also deceased, having died in 2006.   The Consent Decree defines the Estates as including "Wiseman Oil Corp. (and predecessor corporations including Wiseman Road Oil) ('Wiseman Oil') and all officers and shareholders of Wiseman Oil except Robert Wiseman" (who was individually named and contributed to the settlement a comparatively nominal amount).   And the government, in agreeing to settlement of the Underlying Litigation, expressly satisfied itself of the designated parties' ability to pay the recovery costs charged against

---

[18] Cf. Plaintiffs' Memo Opposition to Defendant's MSJ at 16 (noting that Defendant was required to provide a defense until facts were determined sufficient to narrow claim to recovery outside the scope of the policy, and asserting that "[f]urther factual development" confirmed that the Wisemans were sued as owners, officers and directors of Wiseman Oil).

them, and the Consent Decree held each designated individual or entity, including Wiseman Oil, "jointly and severally liable".

Under this chronology, settlement payment in restitution for environmental harm caused by/during Wiseman Oil's conduct of its commercial waste/oil storage and reprocessing operations was made from the residual location of remaining assets at the time, *i.e.*, the Estate of the surviving spouse, Ruth Wiseman.[19] Thus, development of the Underlying Litigation, did not rule out (but rather further evidenced) that the Wisemans incurred costs of defense and liability directly related to their affiliations with and roles in the defunct family Enterprise, Wiseman Oil.[20] The Court further notes that, even in their additional roles as owners of real property subject to liability for harm caused by their lessee, Wiseman Oil, the Wisemans would presumably have been entitled to indemnification/recovery costs from Wiseman Oil. Cf. *supra* (noting that lease required that Wiseman Oil carry insurance in favor of the lessors). Compare November Oral Argument; Defendant's Brief in Support of MSJ at 8-9 (asserting that detailed operational allegations against Breslube (an on-going, financially-viable commercial entity/enterprise) as to Breslube Penn

---

[19] Cf. Plaintiffs' Memo Opposition to Defendant's MSJ at 9-10 (noting that the Wisemans were the operators of Wiseman Oil, that the bankrupt/defunct company had no checking account, that monies were in the hands of Joseph and Ruth Wiseman and at their deaths in their Estates, and that ultimately Ruth Wiseman, as the surviving spouse, and later her Estate, expended litigation and settlement funds because they arose from the activities of the family business and "there wasn't anybody else to pay them" – Defendant having refused to defend). Cf. also Plantiffs' Response to Defendant's Statement of Material Facts.

[20] Cf. Plaintiffs' SUF for PSJ on Duty at 9 (citing to correspondence of record from U.S. Department of Justice regarding litigation settlement, and including in factual basis Wisemans' stock ownership and that they were "intimately involved in the incorporation and ongoing financing, operation and management of Wiseman Oil").

Superfund Site, and absence of claims against Breslube officer, director or stockholder , "merit[] noting" and, in contrast, it "is quite clear" that Plaintiffs were considered responsible under CERCLA "solely because, as individuals, they owned the real property on which Wiseman Oil conducted its business").

### 2. <u>Joseph Wiseman</u>

This Court also notes that, in addition to the three (3) Certificates of Insurance naming Wiseman Oil, Plaintiffs identified a fourth Certificate of Insurance (Policy no. 12069979) also reflecting individual insurance for Joseph Wiseman.   <u>See, e.g.</u>, Plaintiffs' Memo Opposition to Defendant's MSJ at 4 (providing record citations); Defendant's Brief in Support of MSJ at 11. The relevant definition of an Insured under Section IV of the CGL Policy is: "(a) the named insured and, if an individual, the spouse of such named insured if a resident of the same household; (b) if the named insured is designated in the declarations as (1) an individual, the person so designated but only with respect to the conduct of a business of which he is the sole proprietor, and the spouse of the named insured with respect to the conduct of such a business; . . . ."

Defendant asserts that this presumed individual insurance policy clearly afforded no coverage with regard to the Underlying Litigation because it insured Joseph Wiseman, and his spouse, only "if they were sued 'with respect to the conduct of a business'" and "[t]he CERCLA Action is, on its face, not such a claim".   Defendant's Brief in Support of MSJ at 11-12.[21]  But

---

[21]  This Courrt rejects Plaintiff's assertion that the definitional provisions are disjunctive and the provisions of subsection (a) provided broader coverage to the Wisemans, independent of the insurance for conduct of a business under subsection (b).   To the contrary, the form policy

Defendant identifies no business operations of Joseph Wiseman and his spouse other than Wiseman Oil, and their related ownership and leasing of the land on which it operated. Ownership of real property for commercial-enterprise lease (which property is mortgaged for investment in/expansion of the family enterprise) would appear to constitute "conduct of a business" (*i.e.*, commercial activity and/or economic dealings, as opposed to personal, residential or leisure-related property ownership). Moreover, this issue could raise, of course, the question of an insured layperson's reasonable expectations at the time he purchased insurance providing individual business liability protection.

It is, therefore, not clear that, even in the absence of a duty to defend on the part of Defendant arising from its presumed CGL policies insuring Wiseman Oil (which the Court expressly concludes would have been owed), Defendant would have owed no defense in the Underlying Litigation on the basis of its presumed individual insurance policy issued to Joseph Wiseman.[22]

---

language clearly provides, in subsection (a), that the spouse of an individual insured is included within the otherwise applicable scope of coverage. And subsection (b) proceeds to define the policy's scope of coverage as to (1) an individual insured, (2) a partnership or joint venture, and (3) another organization/entity. The individual policy therefore affords coverage, as Defendant asserts, to an individual and his/her spouse "with respect to the conduct of a business . . . ." Compare, *e.g.* Plaintiffs' Memo Opposition to Defendant's MSJ at 14-15.

[22] The Court notes that in light of its conclusions and Recommendation, this issue need not be further addressed at this time. See *supra* at 16-17 ("The Court finds the language of the CERCLA Complaint sufficient basis on which to deny Defendant's asserted entitlement to summary judgment on grounds that the Underlying Litigation was unequivocally outside potential coverage afforded to Wiseman Oil, or to the Wisemans as its officers, directors or shareholders (and,

**B. Pollution Exclusion but for "Sudden and Accidental" Defined Occurrence; Potential Regulatory Estoppel and/or Trade Usage Considerations**

TIG's CGL Policy defines an "occurrence" as an "accident, including continuous or repeated exposure to conditions which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." See Plaintiff's Memo in Support of PSJ on Duty at 17.  And it contains an exclusion for "bodily injury or property damage arising out of the discharge, dispersal, release or escape of . . . toxic chemicals, liquids or gases, waste materials or other . . . contaminants or pollutants into or upon land . . .; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental."  See Plaintiffs' Memo Opposition to Defendant's MSJ at 18 (quoting CGL Policy language from Defendant's Brief in Support of MSJ at 12-13) (the "pollution exclusion" clause).

**1. Potential Releases within "Sudden and Accidental" Pollution Coverage**

Defendant asserts that the Complaint contains no allegations "that could possibly support" a finding/Plaintiffs' proof of releases that "were 'both sudden, meaning abrupt and lasting only a short time, and accidental, meaning unexpected'" as required "as a matter of Pennsylvania law". See, *e.g.*, Defendant's Brief in Support of MSJ at 13-14 (citing and quoting Lower Paxton Township v. U.S. Fidelity & Guaranty Co., 557 A.2d 393 (Pa. Super. 1989); Northern Ins. Co. of New York v. Aardvark Assocs., Inc., 942 F.2d 189, 194 (3d Cir. 1991)); Defendant's Reply Brief in Opposition to Plaintiff's Opposition to MSJ at 4 (asserting, as grounds for coverage exclusion,

conversely, to grant in part Plaintiffs' Motion for Partial Summary Judgment on this issue); and this Report recommends that the Order so hold.").

that CERCLA Complaint does not allege "any sudden and accidental event").

Defendant concludes that *because* the CERCLA complaints "alleged *generally* that waste oil was stored and/or treated at the site from a least 1974 onward and that 'there have been releases, within the meaning of [CERCLA] . . . at or from the Breslube Penn Site", *then* "[a]ccordingly, TIG had no duty to defend or otherwise provide coverage".[23]   But here again, Defendant's analysis of its legal position is misguided by its misunderstanding/misstatement of the scope of its duty.   The proper measure is the *possibility,* under the language of the underlying complaint, of an insured's liability for actions and consequences within the scope of policy coverage.   In addition, as also discussed *supra*, under Pennsylvania law the insurer bears the burden of establishing the applicability of any exclusion or limitation on coverage, as an affirmative defense.

Thus, Defendant's assertion that Plaintiffs were clearly excluded from coverage because (a) the CGL Policy's pollution exclusion clause applies to all releases except those both "sudden" (*i.e.*, abrupt) and "accidental" (*i.e.*, unintended), (b) the CERCLA Complaint makes no specific allegations regarding an abrupt versus gradual nature of any alleged releases, and (c) no allegations of the Complaint could support liability within the "sudden and accidental" exception to the exclusion, simply will not pass muster.   For even accepting, *arguendo*, Defendant's interpretation of the policy provision, it erroneously flips the standard and makes an unduly crabbed assessment of its obligation.

---

[23]  Defendant's Brief in Support of MSJ at 14-15.

The record indicates that it was, indeed, possible that the general allegations in the CERCLA Complaint could, in the circumstances of Wiseman Oil's case and as that case proceeded, be determined to encompass and premise liability upon one or more "sudden and accidental" releases of contaminates at the facility. *And, critically, that Defendant could not reasonably conclude, on the face of the Complaint, that the allegations precluded or negated any potential applicability of these qualifiers.* <u>Compare</u> Defendant's Brief in Opposition to Plaintiffs' Motion for Partial Summary Judgment (Duty to Defend) (hereafter "Defendant's Opposition to Plaintiffs' PSJ on Duty") (ECF No. 84) at 18 (asserting that no allegations of the underlying Complaint could possibly support a "sudden and accidental" release) <u>with</u> Plaintiffs' Memo Opposition to Defendant's MSJ at 18 (noting that CERCLA defines "release" broadly and it includes "spilling", "leaking", or "escaping"); <u>id.</u> at 18-20 (providing citation to cases reiterating the duty to defend where the allegations of releases/exposure "may or may not fall within the exclusion" as opposed, *e.g.*, to where there is a "basis in the complaint for finding" that a release was non-accidental); <u>id.</u> at 25 (noting that no allegations of intentional dumping or regular discharges were asserted, and cases distinguish complaints that do not detail how or when alleged releases occurred and thus "from the facts available" raise liability "potentially within the policy") (quoting <u>Techalloy Co. v. Reliance Insur. Co.</u>, 487 A.2d 820, 827 (Pa. Super. 1984)). <u>See also, *e.g.*</u>, <u>C.H. Heist Caribe Corp. v. Am. Home Assur. Co.</u>, 640 F.2d 479, 483 (3d Cir. 1981); <u>Air Prods. & Chems., Inc. v. Hartford Acc. & Indem. Co.</u>, 25 F.3de 177, 180 (3d Cir. 1994); <u>Am.</u>

<u>Motorists Ins. Co. v. Levolor Lorentzen, Inc.</u>, 79 F.2d 1165, 1168 (3d Cir. 1989).[24]

Plaintiffs introduced - in response to Defendant's assertion that it owed no duty and its affirmative defense of a policy exclusion - evidence of the possibility of liability within the scope of Defendant's interpretation of the CGL Policy's "sudden and accidental" provision, including evidence regarding unusual/unpredictable flash-flooding which could have caused "sudden and accidental" release during Wiseman Oil's operation of its reprocessing facility.   <u>See</u> Plaintiffs' Memo Opposition to Defendant's MSJ at 20-21 (providing citations to record); Plaintiffs' Memo in Support of PSJ on Duty at 24-25.   Defendant's objection that extrinsic evidence is not permissible with respect to its duty to defend, which must be based solely on the four corners of the underlying complaint,[25] again rather misapprehends the jurisprudence.   More specifically, an insurer may not establish that it had no contemporaneous duty to defend by the introduction of evidence that, ultimately, it had no such duty, *because* the standard by which its duty is measured is broader and, accordingly, looks to the *possibility* of duty when the insured requests a defense

---

[24] <u>Cf.</u> <u>Murphy Oil USA, Inc. v. Unigard Security Ins. Co.</u>, 61 S.W.3d 807, 810, 816 (Ark. 2001) (concluding in context of assessment of duty to defend and possibility of coverage, that allegation that insured allowed contaminates to be "discharged and/or released . . . certainly could embrace a sudden release" and accidental spill such as through overestimation of tank capacity, tank valve accidentally left open, or leakage through corroded hole); <u>cf. also</u> <u>id.</u> at 815 (noting opinion of Pennsylvania Supreme Court, in <u>Sunbeam,</u> that "proof of custom in the insurance industry may indicate that the 'sudden and accidental' exception . . . meant 'unexpected' and 'unintended' and not a requirement of abruptness"); discussion *infra*.

[25] <u>See generally</u> Defendant's Reply Brief in Opposition to Plaintiffs' Opposition to MSJ.

24

(and, if denied, as the underlying litigation develops).[26]   But because the insurer has a duty to reasonably assess its defense obligations in light of potential coverage under the facts, whether or not it met those obligations is appropriately, and necessarily, evaluated in light of the facts. See, e.g., Air Prods., 25 F.3d at 180 (noting that "permitting the introduction of evidence to show that an exception to an exclusion applies, while disallowing evidence to show that an exclusion applies" is a "construction against the insurer . . . consistent with general insurance law principles and, in particular, the Pennsylvania rule that requires only a 'potential' of coverage"); Plaintiffs' Memo in Support of PSJ on Duty at 24 n. 6; Plaintiffs' Response to Defendant's Objections to Plaintiffs' Statement of Material Facts (ECF No. 95) at 4-5 (explaining that where complaint neither establishes nor rules out coverage, and duty to defend thus "depends on the existence or non-existence of as yet undetermined facts", insured may properly show that insurer cannot "confine the claim to a recovery" that is outside coverage) (quoting C. Raymond Davis, 467 F.Supp. at 19, and citing additional cases).[27]   Moreover, the Court would not need expert evidence to observe that Defendant, as a general liability insurer in the business of insuring

---

[26] See Defendant's Reply Brief in Opposition to Plaintiffs' Opposition to MSJ at 2 (expressing agreement with Plaintiffs' prior pleading citations and briefing observing that an insurer "can't go back ex-ante and say now that the case is over, I can prove that there would have been no coverage, and so that gets us out of the duty to defend" because "the duty to defend is much broader than the duty to indemnify").

[27] For these reasons, Defendant's citation to Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co., 589 Pa. 317, 331 (2006) as "holding that it was error for the trial court to consider expert reports that suggested torrential rains may have caused damage, *where the complaint against the insured alleged damage that was a result of a different cause*" is entirely inapposite.   Defendant's Opposition to Plaintiffs' PSJ on Duty at 5 (emphasis added).

numerous and varied commercial enterprises, may reasonably have been aware – in conducting a good faith evaluation of its duty to defend - of (a) the possibility of an interim occurrence of severe weather during the years of Wiseman Oil's business operations, and (b) the potential effects, of severe rain in particular, on the operations of a commercial client engaged in the storage and reprocessing of hazardous commercial waste materials (particularly one in proximity to water, *i.e.*, Montour Run).

*As with the issue of a potential insured, this Court finds the language of the CERCLA Complaint a sufficient basis on which to deny Defendant's asserted grounds for entitlement to summary judgment and, conversely, to grant in part Plaintiff's Motion for Partial Summary Judgment on the question of Defendant's duty to defend . Here, it is sufficient basis to reject Defendant's alternative assertions that the Underlying Litigation was clearly outside its potential defense or coverage obligations as an insurer for pollution harm arising only from a "sudden and accidental" release; and the Report recommends that the Order so hold.*

## 2. Potential Regulatory Estoppel or Trade Usage Considerations Affecting Pollution Exclusion Clause

The Report further notes, however, that Defendant's earlier assertion that it is "well settled" Pennsylvania law that the term "sudden and accidental", in a standard industry pollution exclusion clause, carries a "temporal" restriction (*i.e.*, abruptness and brevity) was - as Defendant effectively acknowledged during November Oral Argument - a patent misstatement. The law in Pennsylvania regarding the scope of this industry-standard pollution exclusion exception is unsettled, and the Pennsylvania Supreme Court has expressly indicated an insured's right to

present evidence regarding considerations of both regulatory estoppel and trade usage.[28]

More specifically, the Pennsylvania Superior Court, in 1989, declined to consider the plaintiff's evidence "concerning the drafting history and regulatory approval process of" the pollution exclusion exception, and declined to consider implications of regulatory estoppel or custom/trade usage, holding that "the plain meaning of [the phrase 'sudden and accidental'] requires that damages resulting from gradual releases of pollution are excluded from coverage." Lower Paxton Twp. v. U.S. Fidelity & Guaranty Co., 557 A.2d 393, 397 (Pa. Super. 1989); id. at 399-402 (concluding that because exclusion's "everyday meaning" covers only pollution discharges that are "both sudden, meaning abrupt and lasting only a short time, and accidental, meaning unexpected", "[a]ny other interpretation [would be a] blatantly unreasonable" revision of "a clear intent"). In 1991, the Court of Appeals for the Third Circuit held, in New Castle County v. Hartford Accident & Indemn. Co., 933 F.2d 1162, 1198 (3d Cir. 1991), a case arising under Delaware law, that given prior trade usage and representations made, the phrase "sudden and accidental" should - in the context of a pollution exclusion clause – be construed to mean

_____

[28] Compare Defendant's acknowledgment at the November oral argument that question of regulatory estoppel is not decided in Pennsylvania with Defendant's Brief in Support of MSJ at 13 (characterizing Lower Paxton as the law in Pennsylvania); Defendant's Opposition to Plaintiffs' PSJ on Duty at 18 (asserting that "sudden and accidental" pollution exclusion "would bar any potential coverage . . . under Pennsylvania law"); id. at 22 (noting that CERCLA Complaint contained no allegation of "any release . . .that was 'sudden and accidental' as that unambiguous phrase has been interpreted by Pennsylvania's courts"). Cf. Defendant's Brief in Opposition to Plaintiffs' Motion for Partial Summary Judgment (Regulatory Estoppel) ("Defendant's Opposition to Plaintiffs' PSJ on RE") (ECF No. 87) at 1 (stating that scope of "sudden and accidental" exception is one "of state law that has never been substantively decided in an insured's favor by any Pennsylvania state court").

"unexpected and unintended".[29]   But the Court declined to extend that holding to a case under Pennsylvania law, noting that it felt "constrained to reach a different conclusion".   Northern Ins. Co. of New York v. Aardvark Assocs. Inc., 942 F.2d 189 (3d Cir. 1991) (concluding that, in accordance with Lower Paxton's rejection of "lengthy argument and documentary materials", the exception applied, in Pennsylvania, only to abrupt and unintended releases); id. at 193 (expressly noting, in so holding, that the Circuit Court could not then "say that the Supreme Court of Pennsylvania would reach a conclusion different from that of the Superior Court . . . if it confronted the issue" of the meaning of "sudden and accidental" in the pollution exclusion clause).[30]

But the question of proper considerations in the Court's interpretation of the "sudden and accidental" exception, elucidated by evolving factual history and jurisprudence, *did* come before the Supreme Court of Pennsylvania in 2001, more than a decade after the intermediate Court's holding in Lower Paxton.   And in that decision, the Pennsylvania Supreme Court concluded that (1) *the doctrine of regulatory estoppel applied* to the question of recovery, under the then-standard CGL Policy pollution exclusion clause, for liability for the clean-up of environmental pollution occurring over time; (2) *industry custom or trade usage is always relevant* and admissible in

_____

[29]  See also New Castle County v. Hartford Accident and Indemnity Co., 970 F.2d 1267, 1269 (3d Cir. 1992) (noting that Circuit had previously upheld Delaware Court's determination of meaning of term).

[30]   Cf. UTI Corp. v. Fireman's Fund Ins. Co., 896 F.Supp. 362, 371-72 (D.N.J. 1995) (discussing issue of estoppel as to asserted pollution exclusion based on insurer's representations that exclusion was intended only to clarify coverage previously afforded, *i.e.*, to maintain coverage for pollution arising from "unexpected or unintended" events).

construing commercial contracts *and does not depend on any obvious ambiguity in the contract*; and (3) *the industry's memorandum to the State Department of Insurance* when seeking approval of the exception *was admissible, "strong evidence" of a custom or special/trade usage that "sudden and accidental" meant only "unexpected and unintended" and added no new requirement of abruptness* where the memo – drafted by a consortium of insurers purporting to represent the industry as a whole - represented that the modification would not result in any significant decrease in coverage and that coverage would continue for pollution or contamination-caused injuries resulting from an "accident".   See Sunbeam Corp. v. Liberty Mutual Ins. Co., 781 A.2d 1189 (Pa. 2001).   Indeed, the Court went on to state that

> *Having represented to the insurance department, a regulatory agency, that the new language in the . . . policies – "sudden and accidental" – did not involve a significant decrease in coverage from the prior language, the insurance industry will not be heard to assert the opposite position when claims are made by the insured policyholders*.   The United States Court of Appeals for the Third Circuit recently reached the same conclusion in *Essex Chemical Corp. v. Hartford Accident and Indemnity Co.*, . . . (following New Jersey Supreme Court's application of the doctrine of regulatory estoppel based on insurance industry's identical representations made to New Jersey insurance commission).[31]

---

[31]  Sunbeam, 781 A.2d at 1193 (emphasis added).   See also Essex Chem. Corp. v. Hartford Accid. & Indemn. Co., 1995 WL 861533, *2 (D.N.J. Dec.15, 1995) (relying on New Jersey Supreme Court's conclusions that: insurance industry changed unexpected/ unintended language to sudden/accidental with purpose of "materially and dramatically reduc[ing] pollution insurance coverage for all insureds"; industry "purpose[ly] ... misl[ed]" regulators by suggesting that new language was intended merely "to permit underwriters to perform their traditional function" of precluding coverage for insureds who "knowingly pollut[e]"; and regulatory estoppel "bound the industry to [its] original stated purpose") (as cited with parenthetical in Hussey Copper, Ltd. v. Royal Ins. Co. of America, 2009 WL 2913959, *8 (W.D. Pa. Sept. 9, 2009)).   Cf. generally Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment (Regulatory Estoppel) ("Plaintiffs' Memo in Support of PSJ on RE") (ECF No. 68) (comprehensively summarizing regulatory history in Pennsylvania and other states); id. at 9 n. 2 (citing New Castle and other cases relating history, which is "well documented").   Compare Defendant's Opposition

The Supreme Court held that "[a]ccordingly it was error to dismiss the complaint without applying the doctrine of regulatory estoppel" and reversed the Lower Court's dismissal,[32] and remanded the case for further proceedings, including judicial consideration of regulatory estoppel and custom/trade usage in determining the meaning of "sudden and accidental". See further discussion, *infra*.[33]

---

to Plaintiffs' PSJ on Regulatory Estoppel at 2 (asserting that consideration of regulatory estoppel would require the re-opening of discovery "to allow extensive investigation of this issue"); id. at 23 (requesting same).

Cf. Hussey, 2009 WL 2913959 at **9-10 (noting that the sudden/accidental provision is a "clause ... of nationwide application [that] has been subject to interpretation in many, if not all states," and the Essex Court concluded "that New Jersey's application of regulatory estoppel 'promote[d] a harmonious result' regarding [its] interpretation"). Cf. also Plaintiffs' Memo Opposition to Defendant's MSJ at 23 (providing citations to decisions reversing/revising prior holdings and scholarship concluding that broader interpretation of pollution exclusion exception should be considered/applied rather than implemented as "unambiguous"); Plaintiffs' Memo in Support of PSJ on RE at 24-25 (discussing division/divergence in courts as to meaning of "sudden" in the qualified pollution exclusion).

[32] The Sunbeam trial court had dismissed the complaint, and the Superior Court had affirmed, on grounds including that "the common meaning of the words 'sudden and accidental' is unambiguous and does not cover pollution occurring gradually over a long period of time whether or not [it] was unexpected and intended." Id. at 1192.

Compare Littitz Mutual Ins. Co. v. Steely, 785 A.2d 975, 982 (Pa. 2001) (noting that in Sunbeam the Supreme Court "accepted an insured's argument that, under the law of contracts, evidence of industry custom or trade usage is always relevant and admissible to demonstrate that words used in a commercial contract have a specialized meaning in the trade or industry", the contract language need not be ambiguous, and if custom or usage is established, "it will be considered part of the contract, the presumption being that the contracting parties . . . contracted with reference to it").

[33] Cf. Defendant's Objections to Magistrate's May 29, 2012 Report and Recommendation at 4-5

Despite its clearly and expressly articulated correction of <u>Lower Paxton</u>'s ambiguity-prerequisite to considerations of trade usage in contract interpretation, the Supreme Court found it unnecessary to formally abrogate such language (which it noted the "Superior Court [had been] disinclined to revisit"). 781 A.2d at 1194. Instead, the Supreme Court observed that "[r]egardless of the viability of <u>Lower Paxton Twp.</u>, *supra*, the [lower] court [apparently] misconstrued appellants' argument . . . to be that the insurance industry's . . . memorandum *created* the 'custom in the industry' rather than that the memorandum *was evidence* of a settled usage at the time." <u>Id.</u> at 1194 (emphasis in original). <u>See also id.</u> at 1194-95 (concluding that given asserted effects of memorandum as (a) "promis[ing] the insurance department that the new language proposed . . . did not reduce the coverage provided" and (b) "making a public statement that in the insurance industry the words 'sudden and accidental' have a special meaning – that they mean the same thing as the words 'unexpected and unintended'", "[i]t was error, therefore, to . . . dismiss the complaint on the authority of <u>Lower Paxon Twp.</u>, *supra*, as well as to disregard the effect of regulatory estoppel"). [34] As noted above, the case was remanded for further proceedings

_____

(noting that this Court "is required to adhere to the law expressed by the state's highest court" and discussing considerations, such as "relevant state precedents, analogous decisions, considered dicta . . . and any other relevant data", in assessing "how the highest court in the state would decide the issue at hand") (quoting <u>Mele v. Nutmeg Bakers Supply</u>, 580 F.Supp. 887, 889 (E.D. Pa. 1984); <u>McKenna v. Ortho Pharmaceutical Corp.</u>, 622 F.2d 657, 663 (3d Cir. 1980)). <u>Cf. also</u> <u>Simon Wrecking Company, Inc. v. AIU Ins. Co</u>, 530 F.Supp.2d 706, 711-12 (E.D. Pa. 2008) (concluding that "the opinions of the Pennsylvania Supreme Court must govern" decisions regarding meaning of "sudden and accidental").

[34] <u>Cf.</u> <u>Simon Wrecking</u>, 530 F.Supp.2d at 714 (concluding that rather than "revisit" <u>Lower Paxton</u>, the Pennsylvania Supreme Court "formulated trade usage as a separate inquiry from the question

– including the trial court's determination of the purpose and meaning of the industry's

memorandum and policy revision; and, as the case settled, it did not come again before the

Pennsylvania Supreme Court.   Id. at 1195.[35]

In sum, following an extended and careful review of the regulatory and case histories, it

seems clear that the Pennsylvania Supreme Court's analysis in Sunbeam requires this Court's

evaluation – where, *e.g.*, a CGL Policy insurer maintains it as an affirmative defense and resolution

of its meaning is necessary to determination of the duties disputed - of the scope of the industry's

---

of ambiguity" and "[a]dditionally" held that it was error to dismiss the complaint without
consideration of regulatory estoppel).

[35] Following Sunbeam, our sister Court for the Eastern District of Pennsylvania observed that the
Pennsylvania Supreme Court's decision "radically altered the legal landscape" in Pennsylvania.
Simon Wrecking, 530 F.Supp.2d at 713; see generally id. (discussing, in context of motions for
partial summary judgment, application of regulatory estoppel in light of insurer's alleged
representations to Pennsylvania Insurance Department that revised language in CGL Policies
would not result in any significant decrease in coverage).   This sister Court has also expressly
held that, in Sunbeam, "the Supreme Court of Pennsylvania held that the meaning of the 'sudden
and accidental' exception to the standard pollution exclusion clause included in insurance liability
policies should be interpreted based on the custom and usage of terms in the industry . . . [and]
concluded that the exception applies to both gradual and abrupt pollution or contamination as long
as it is unexpected and unintended."   Bituminous Casualty Corp. v. Hems, 2007 WL 154564 at *6
(E.D. Pa. May 3, 2007) (distinguishing "purposeful business activity as to which resulting property
damage" could or should have been expected by the insured where hazardous substances were
"continuous[ly] and systematic[ly]"dumped in a New Jersey landfill over an eight year period).
But see Simon Wrecking, 530 F.Supp.2d at 715 (concluding Pennsylvania Supreme Court "chose
not to determine the issues of trade usage and regulatory estoppel [but] remanded the case to the
trial court to decide"); Simon Wrecking Co. v. AIU Insur. Co., 350 F.Supp.2d 624, 641 (E.D. Pa.
2004) (concluding that, under Sunbeam, trial "court would have to make factual findings" as to
insurance industry's representations in determining applicability of doctrine of regulatory
estoppel).   Cf. Memorandum Order at 3, n. 1.

"sudden and accidental" pollution exclusion exception, (a) with reference to both regulatory estoppel and trade usage and (b) in accord with other guidance as to these considerations set forth in the <u>Sunbeam</u> decision.   See *supra*; <u>cf.</u> Plaintiffs' Memo Opposition to Defendant's MSJ at 22 (asserting that grant of summary judgment in this case without consideration of regulatory estoppel or trade usage would violate Pennsylvania law).[36]

Finally, although the Plaintiffs in <u>Sunbeam</u> elected to include in their Complaint allegations regarding the insurance industry's representations to the Pennsylvania insurance department,[37] this Court concludes there is no requirement that regulatory estoppel be affirmatively pled.   To the contrary, as the Pennsylvania Supreme Court has expressly observed, regulatory estoppel (or "judicial estoppel" based on representations made to/positions taken before regulatory agencies) is an "equitable, judicially-created doctrine designed to protect the integrity of the courts by preventing litigants . . . [from] adopting whatever position suits the moment. . . .

---

[36] The Court feels compelled to observe that, in light of this jurisprudential history, it found Defendant's initial omission of any mention of the Pennsylvania Supreme Court's 2001 consideration of this question in <u>Sunbeam</u> surprising - particularly in the context of Defendant's representations and implications to this Court regarding current Pennsylvania law.   See, *e.g.*, discussion and citations to Defendant's Brief in Support of MSJ, *supra*.   <u>See also</u> Defendant's Brief in Support of MSJ at 13 ("In Pennsylvania, this exclusion has been determined to be clear and unambiguous and to operate to absolve an insurer of any duty to defend or indemnify an insured for any claims associated with a release of pollutants that is alleged to have occurred gradually over a period of time."); <u>id.</u> at 13-14 (emphasizing prior decisions' language regarding "clear and plain" meaning of phrase, and consequent exclusion of gradual pollution coverage limitations, without acknowledgement that the Supreme Court had expressly called <u>Lower Paxton</u> into question and expressly rejected its view of the determinative character of (*i.e.*, preclusion based preemptively upon) common meaning).

[37] <u>See Sunbeam</u>, 781 A.2d at 1192.

Unlike collateral estoppel or *res judicata*, it does not depend on relationships between parties, but rather on the relationship of one party to one or more tribunals." Sunbeam, 781 A.2d at 1192. It may, therefore, be invoked in response to Defendant's invocation of an affirmative defense or Motion for Summary Judgment, and at the Court's discretion. See, *e.g.*, Hussey, 2009 WL 2913959 at *11 (observing that "Plaintiff first raised regulatory estoppel in conjunction with its opposition to Defendants' Motions for Summary Judgment" and in accordance with Sunbeam was permitted to explore and present the regulatory estoppel issue); UTI, 896 F.Supp. 362 (containing no suggestion that regulatory estoppel was pled, but appearing to the contrary that Defendants moved for summary judgment on the pollution exclusion and Plaintiff cross-moved on grounds of estoppel); Plaintiffs' Reply Memorandum in Support of Partial Summary Judgment on Regulatory Estoppel ("Plaintiffs' Reply Memo in Support of PSJ on RE") (ECF No. 96) at 2 (citing to PL Ex. 14 at paras. 30-31 and Atts. G-H regarding cases "consider[ing] this doctrine where it was not pled in a complaint").[38] Compare Defendant's Opposition to Plaintiffs' PSJ on RE at 18 n. 10 & 21 (asserting that regulatory estoppel "claim" must be "properly pleaded" at a time when complaint may be amended); id. at 1 (asserting that regulatory estoppel is "a claim that does not exist in this

---

[38] Cf. id. at 371 (concluding that Court "need not decide" question of estoppel based on industry representations to state regulatory agencies where plaintiff presented "sufficient evidence to support its position that it reasonably expected . . . pollution exclusion to provide coverage for gradual pollution claims" based on evidence of representations made to it by defendant – *i.e.*, that new exclusion language retained the same meaning as in the prior CGL form, providing coverage as long as the event(s) giving rise to liability were neither expected nor intended by the insured). Cf. also Sunbeam, 781 A.2d at 1192 (noting that "even without pleading or proving reliance by the insurance department, the allegation of estoppel should not have been dismissed").

case" and "Plaintiff's failure to allege regulatory estoppel as a cause of action, or to timely amend their complaint to add such a claim, acts as a waiver") with New Hampshire v. Maine, 532 U.S. 742, 750-51 (2001) (discussing application of judicial estoppel as an equitable doctrine invoked by the Court at its discretion). In the case *sub judice*, Plaintiffs have pled their entitlement to insurance coverage, and the issue of regulatory estoppel is neither a separate cause of action nor a part of their *prima facie* case; rather, it is a rebuttal to Defendant's affirmative defense of an applicable pollution exclusion (and one which Plaintiffs raised in the April Oral Argument).[39]

### C. Existence of Possible Occurrence

As noted above, Defendant's CGL Policy defined "occurrence" as an "accident, including continuous or repeated exposure to conditions which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." See Plaintiff's Memo in Support of PSJ on Duty at 17. Cf. Sunbeam, 781 A.2d at 1195 (noting that CGL policies defined "occurrence" as "an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage that was neither expected nor intended from the standpoint of the insured").

---

[39]  See Plaintiffs' Reply Memo in Support of PSJ on RE at 2-4 (noting that when, at April Oral Argument, Defendant raised prospective filing of motion on qualified pollution exclusion, Plaintiffs indicated such motion would implicate regulatory estoppel and promptly supplemented its discovery with, *e.g.*, related declarations, deposition transcripts and document databases in June, 2012, as to which Defendant undertook no responsive discovery); cf. Defendant's Opposition to Plaintiffs' PSJ on RE at 4 n. 3.

Although Defendant did not raise the non-existence of an "occurrence" in its Brief in Support of MSJ's itemization of grounds for summary judgment, it does assert, in the context of its Reply Brief in Opposition to Plaintiffs' Opposition to MSJ that "the CERCLA Complaint did not allege an 'occurrence'".[40] And it further suggests, in its Opposition to Plaintiffs' PSJ on Duty, that pollution created on the site was a result of Wiseman Oil's "routine business practices" and "day-to-day operations" (*i.e.*, collecting, storing and reprocessing a variety of waste materials) and therefore not within any policy coverage. Defendant's Opposition to Plaintiffs' PSJ on Duty at 14-16 (citing Fischer & Porter Co. v. Liberty Mut. Ins. Co., 656 F.Supp. 132 (E.D. Pa. 1986) (finding no "occurrence" where contamination source was "employees' dumping" and "resulted from voluntary acts within the regular, routine business operations"));[41]

As Plaintiffs counter, commercial waste/oil storage and reprocessing operations are activities and business operations distinguishable from either (a) intentional dumping or (b) "landfill" cases, in which such business operations, by their nature, have given rise to the "routine pollution" of the environment.[42] Wiseman Oil's storage and reprocessing, in contrast, constituted

---

[40] Defendant's Reply Brief in Opposition to Plaintiffs' Opposition to MSJ at 3. See also Defendant's Opposition to Plaintiffs' PSJ on RE at 1 n. 1.

[41] This Report need not further elaborate on the antithetical nature of this case. See Plaintiffs' Reply Memorandum of Law In Support of Motion for Partial Summary Judgment (Duty to Defend) ("Plaintiff's Reply in Support of PSJ on Duty")(ECF No. 93) at 4 n. 1 (detailing long-standing routine polluting practices as alleged and established by evidence).

[42] See Plaintiffs' Memo Opposition to Defendant's MSJ at 24-25 (distinguishing Lower Paxton and Aardvark Assocs., which involved contamination from landfills "where waste materials were intentionally buried in the ground over many years"); id. at 25 (also distinguishing Techalloy,

business operations in which accident – rather than the routine conduct or nature of the enterprise - *could* result in environmental pollution; and *that*, as fully explained *supra*, is the consideration in evaluating an insurer's duty to defend.[43]

### D. Conclusion as to Defendant's Motion for Summary Judgment

In sum, Plaintiffs' briefing points persuasively to language of the CERCLA Complaint and to provisions of the presumed CGL policies (and to additional evidence of record) indicating that – as to each of the above factors, and under a reasonable contemporaneous interpretation/evaluation of the applicable language at issue - Defendant owed a duty to defend in the Underlying Litigation. Defendant's denial of this insurance obligation required a clearly and reasonably-premised ruling-out of any such duty, giving appropriate scope to the possibilities of liability raised by the Underlying Litigation. This Court finds, for the reasons detailed above, that Defendant would –

---

which included allegations that plaintiff "had recklessly dumped" hazardous chemicals over a 25-year period).

[43] Compare Defendant's Opposition to Plaintiffs' PSJ at 14-16 (repeatedly asserting absence of express allegation in CERCLA Complaint that contamination "was the result of an accident" or "anything other than the result of the regular, routine business operations of Wiseman Oil and Breslube") with Plaintiffs' Memo Opposition to Defendant's MSJ at 18 (citing, *e.g.*, the Third Circuit's decision in C.H. Heist, 640 F.2d at 483 (concluding that where "there is no basis in the complaint for finding that [the release] was non-accidental . . . the allegations . . . state on their face a claim . . . to which the policy potentially applies")). See generally Plaintiffs' Reply in Support of PSJ on Duty at 4-5; see also id. at 6 n. 3.

under the putative policy provisions – have owed such duty.[44]   It therefore recommends denial of Defendant's Motion for Summary Judgment.


## V.   ANALYSIS AS TO PLAINTIFFS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT

As discussed in this Court's July 26, 2012 telephone conference with counsel (see ECF No. 78), and as noted in its Memorandum Order, Sections A and B, and portions of Section C, of Plaintiffs' Motion for PSJ on Duty, addressing bases for a finding that Wiseman Oil and/or Joseph Wiseman *were insured* by Defendant for periods of liability in the Underlying Litigation, are irrelevant to this stage of the bifurcated pleadings, which were proceeding in accordance with Defendant's request that the existence of the policies in question under the Certificates of Insurance be - for purposes of assessing entitlement to summary judgment – presumed.[45]

---

[44]  As noted above, under Pennsylvania law, the interpretation of the scope of coverage of an insurance contract is a question of law properly decided and enforced by the Court.   See, *e.g.*, Med. Protective Co. v. Watkins, 198 F.3d 100, 103 (3d Cir.1999); Standard Venetian Blind Co. v. Am. Empire Ins. Co., 469 A.2d 563, 566 (1983); see also State Farm Fire & Cas. Co., 589 F.3d at 110 (noting that, in determining whether an insurer owes a duty to defend, the Court must examine the allegations in the underlying complaint and the language of the applicable insurance policy). Cf., *e.g.*, Pac. Indem. Co. v. Linn, 766 F.2d 754, 760 (3d Cir. 1985) (noting that an insurance company is obligated to defend an insured whenever the complaint filed by the injured party may *potentially* come within the policy's coverage); discussion *supra*.

[45]  Cf. Defendant's Opposition to Plaintiffs' PSJ on Duty at 1 n. 1.   Although the Court had expressly set aside –for purposes of these Motions - the question of Defendant's issuance of insurance policies in the circumstances *sub judice,* it notes that – at least at this point – the record as to the existence of CGL insurance appears persuasive.   See also, *e.g.*, American States Ins. Co. v. Mankato Iron & Metal, Inc., 848 F.Supp. 1436, 1440-41 (D. Minn. 1993) (putative insured submitted evidence of the missing policy numbers and effective dates, and that insurer had issued

The Court nonetheless concludes, for the reasons set forth at length in this Report, that Plaintiffs' Motion for Partial Summary Judgment as to Defendant's Duty to Defend (ECF No. 64) should be granted in part, to reflect the Court's limited issue determination – *i.e.*, that the putative policy terms would not have clearly excluded, under the applicable standards, potential insurance coverage as to the Underlying Litigation, but would rather have given rise to a duty to defend on the part of the Defendant.   Under the terms of the presumed CGL policies, neither the definitions of the potential insureds nor policy exclusions (nor any other putative policy language before this Court) would abrogate – under the relevant record - Defendant's duty.   The Court further concludes that Plaintiffs' Motion for Partial Summary Judgment on Regulatory Estoppel (ECF No. 67) should be denied as moot, given its conclusion that the language of the CERCLA Complaint did not preclude the possibility of a covered occurrence, even accepting, *arguendo*, Defendant's interpretation of the "sudden and accidental" policy provision.[46]

---

missing policies as CGL policies which contained related coverage clause that appeared without substantial variation for years); <u>Americhem Corp. v. St. Paul Fire and Marine Ins. Co.</u>, 942 F.Supp. 1143, 1146 (W.D. Mich. 1995) (insured showed terms of lost policy by declarations form and coverage form, which were state-approved comprehensive general liability forms that insurer used during relevant time frame); <u>Cf.</u> 2 *Handbook on Insurance Coverage Disputes,* § 17.04, at 1150 ("When the type of policy is known, it may be possible to establish the terms and conditions of the policy by reference to a standard form, such as the Comprehensive General Liability policy developed by the Insurance Services Office").

[46]   The Court wishes to reiterate at this juncture of the litigation that, as to the CGL Policy's pollution exclusion clause: (1) it appears to this Court that regulatory estoppel need not be affirmatively pled; and (2) the Court's careful reading of key Pennsylvania and Third Circuit cases, together with other related case law and documents concerning the regulatory history, leave it with the strong impression that, although there have been some inexactitudes in some of the writings, preclusion of liability, or preclusion of consideration of "trade usage" or "regulatory

## VI. **RECOMMENDATION**

Accordingly, upon review of the pleadings and briefs of record, as well as the evidence before the Court, and on the grounds expressly delineated above, it is respectfully recommended that Defendant's Motion for Summary Judgment (ECF No. 69) be denied; Plaintiffs' Motion for Partial Summary Judgment on Defendant's Duty to Defend (ECF No. 64) be granted in part and denied in part as set forth herein; and Plaintiffs' Motion for Partial Summary Judgment on Regulatory Estoppel (ECF No. 67) be denied as moot and without prejudice.   For reasons provided *supra*, n. 9, it is further recommended that Defendant's Objections Pursuant to Rule 56(C)(2) to Plaintiffs' Statement of Material Facts (Docket Nos. 86 and 90) also be denied.

In accordance with the Magistrate Judges Act, 28 U.S.C. Section 636(b)(1)(B) and (C), and Rule 72.D.2 of the Local Rules of Court, the parties are allowed fourteen (14) days from the date of service of a copy of this Report and Recommendation to file objections.   Any party opposing the

---

estoppel" in assessing liability for environmental pollution under a CGL Policy containing the industry's "sudden and accidental" form language is – as to Pennsylvania law - decidedly *not* well settled.   Indeed, to the contrary, in <u>Sunbeam</u>, the Pennsylvania Supreme Court (a) found it unnecessary, at that stage of the litigation, to issue a holding that would formally abrogate language of <u>Lower Paxton</u>; but (b) nonetheless clearly concluded that the policyholder should be afforded the opportunity to present evidence to the trial court on the effect of both regulatory estoppel and trade usage on the "sudden and accidental" pollution exclusion exception in related CGL policy coverage determinations.

objections shall have fourteen (14) days from the date of service of objections to respond thereto.

Failure to file timely objections will constitute a waiver of any appellate rights.

_____

Lisa Pupo Lenihan
United States Chief Magistrate Judge

Date:   January 22, 2013